**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

───────────────────────────────────────────

BRAD NOURSE, both individually and on behalf of a
class of others similarly situated,

                                    Plaintiff,                    1:17-cv-00807 (BKS/DJS)

v.

THE COUNTY OF JEFFERSON,

                                    Defendant.

───────────────────────────────────────────

**APPEARANCES:**

*For Plaintiff:*
Elmer Robert Keach, III
Maria K. Dyson
Law Offices of Elmer Robert Keach, III, PC
One Pine West Plaza, Suite 109
Albany, New York 12205

*For Defendant:*
Teresa M. Bennett
Anneliese Aliasso
Barclay Damon LLP
125 East Jefferson Street
Syracuse, New York 13202

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Brad Nourse brings this proposed class action under 42 U.S.C. § 1983 against

Defendant County of Jefferson, New York, alleging that his Fourth Amendment right against

unreasonable searches was violated when he was strip searched during intake processing at the

Jefferson County Jail (the "Jail") without being provided reasonable time to post bail. (Dkt. No.

1).  Presently before the Court is Plaintiff's motion for class certification under Rule 23 of the

Federal Rules of Civil Procedure. (Dkt. No. 43). Plaintiff asks the Court to certify "[a]ll persons who have been or will be placed into the custody of the Jefferson County Jail after being charged with misdemeanors, violations, traffic infractions, civil commitments or other minor crimes and being eligible for bail, and were or will be immediately strip searched upon their entry into the Jefferson County Jail . . .  and who posted bail within four hours of their entry into the facility." (*Id.* at 1). The proposed class period commences on July 21, 2014 and extends to the present. (*Id.*). Defendant opposes the motion. (Dkt. No. 55). For the following reasons, Plaintiff's motion for class certification is denied.

## II.    BACKGROUND

In support of his motion for class certification, Plaintiff relies on the Complaint, (Dkt. No. 1), his deposition testimony, (Dkt. No. 44-1), the depositions of two County representatives, Officer Ellen Gallamore, the Jail's Booking Records Officer, (Dkt. No. 44-2, at 9), and Sergeant Robert Newton, Training and Special Duties Supervisor, (Dkt. No. 44-3, at 11), and several exhibits. (Dkt. Nos. 44-5, -6, -7). Defendants have submitted a number of exhibits in opposition, including an affidavit by Lieutenant Kristopher Spencer, the Corrections Lieutenant for the Jefferson County Sheriff's Office. (*See generally* Dkt. No. 55). The Court has carefully considered all the evidence and outlines the evidence relevant to the disposition of the motion for class certification.

### A.    Booking and Strip Searches of Detainees at Jefferson County Jail

The Jail, which can house approximately 150 male and female inmates in its general population, has "one booking area," with "seven holding cells" and a strip search room. (Dkt. No. 55-7, ¶ 7; Dkt. No. 44-2, at 15, 17, 80). One booking officer and one booking roving officer are assigned to the booking area. (Dkt. No. 55-7, ¶ 6). In addition to processing "approximately twelve (12) admissions per day," "dozens of inmates are processed through the booking area

daily for purposes of court appearances, medical issues, disciplinary issues and removal to other facilities."[1] (*Id.*). In his affidavit, Lt. Spencer stated that "[r]egardless of the amount at which bail is set, all new detainees are immediately processed for assignment to the general population for a number of reasons, including the lack of space to hold detainees while they arrange to meet bail requirements, the safety of [the Jail's] staff, the safety of the inmate population and the safety of the new detainee." (*Id.* ¶ 4).

County "detainees charged with felonies, gang related crime, or weapon and drug charges" and detainees charged with lessor crimes or violations[2] "are processed through the same booking area." (*Id.* ¶ 5). Of the seven holding cells, three "are contracted out to the City of Watertown, and are not generally available for use by the County" ("City side").[3] (*Id.* ¶ 7). The City side cells are labeled H1, H2, and GH2 and are designated for City of Watertown pre-arraignment detainees from the Watertown Police Department.[4] (Dkt. No. 44-2, at 21–22). The "County side" of the booking area has four cells—GH1, Med 1, Med 2, and Med 3. (Dkt. No. 55-9, at 14). The "Med" cells are "medical holding cells that contain a single bunk (to accommodate one person)" and "are reserved for inmates with medical or health issues requiring observation." (Dkt. No. 55-7, ¶ 7). Generally, County post-arraignment detainees are placed in GH1, which has a "hard bench" and a telephone and can seat up to ten—but not

---

[1] These inmates are also processed on return to the Jail. (Dkt. No. 55-7, ¶ 6).

[2] Approximately half of the post-arraignment detainees are charged with misdemeanors or minor crimes. (Dkt. No. 44-2, at 131–32).

[3] However, a County detainee may be held on the City-side for a short period of time if needed. (Dkt. No. 44-2, at 169).

[4] In accordance with its contract with the City of Watertown, the County takes "no more than three City admissions at one time." (Dkt. No. 44-2, at 22). All City pre-arraignment detainees are strip-searched as soon as they arrive at the Jail. (*Id.* at 30). Plaintiff is not challenging the constitutionality of the strip searches of pre-arraignment City detainees in this case. (Dkt. No. 45, at 14 n.9).

"[c]omfortably."[5] (Dkt. No. 44-2, at 38, 162; Dkt. No. 55-7, ¶ 7). Male and female detainees are not held in GH1 together. (Dkt. No. 44-2, at 120). A female detainee may be placed in a medical cell if there is a male detainee is in GH1. (*Id.*). "Minors have to go in their" own cells. (*Id.* at 167). Lt. Spencer stated that "[b]ecause of these space limitations, newly admitted detainees cannot be and are not segregated alone in the booking area, and cannot be and are not segregated from other detainees based upon the severity of their pending offenses." (Dkt. No. 55-7, ¶ 8).

On arrival, County post-arraignment detainees enter the "pat-down area" of the Jail, where they are subject to a visual inspection and pat-down search for contraband by a Jail officer. (Dkt. No. 44-2, at 64). Officers place items removed during a pat-down search, such as a lighter or cigarettes, in a property bag and store it with the detainee's property. (*Id.* at 67).

After the pat-down search, the detainee enters the booking area and is strip searched.[6] (*Id.* at 64, 111). A "thorough search allows the booking rover to identify evidence of gang affiliation, contagious disease, weapons, drugs and other contraband." (Dkt. No. 55-7, ¶ 10). Lt. Spencer explained that "allowing a new detainee to sit in a holding cell with other detainees (some with pending felony charges) for four hours without conducting a thorough search creates a substantial risk of injury to others, drug overdose, transmission of disease, etc." (*Id.*). In the strip search room, there is a shower area and a plastic chair, so a detainee can "sit to put on . . . clothing." (*Id.* at 80). The search is conducted in the shower area. (*Id.*). All detainees who arrive at the jail are strip-searched, regardless of age, reasonable suspicion, or personal circumstances. (*Id.* at 148–49).

---

[5] Lieutenant Spencer stated that GH1 was "equipped to accommodate only three detainees at a time." (*Id.* ¶ 7). Gallamore testified that "probably" six would be the largest number of people that could be placed in GH1. (Dkt. No. 44-2, at 39).

[6] Gallamore testified that even if a post-arraignment detainee arrived at the jail requesting to wait in the booking area—saying "My husband is on his way right now . . . to post my bail," the detainee would still have to "get patted down, booked in, strip-searched," and fingerprinted. (Dkt. No. 44-2, at 9, 121–23).

During strip-searches of female detainees, the female officer conducting the search instructs the detainee to remove her clothing, including all undergarments. (*Id.* at 81, 83). The officer searches each item of clothing. (*Id.* at 81). The officer then asks the detainee "to place their arms above their head and turn around, and then squat [down] and cough." (*Id.* at 84). When the detainee squats and coughs, the officer is "observing to make sure nothing . . . comes out." (*Id.* at 85). If the officer notices or suspects the detainee has something in her vagina, she may ask the detainee to remove the item. (*Id.* at 90). The officer may ask the detainee to lift her breasts. (*Id.* at 94). If the officer observes that the detainee has piercings in different body areas, including the nipple or labia, she will instruct the detainee to remove the piercing. (*Id.* at 97). If the spaces between the labia are "not visible," the officer may ask the detainee to spread her labia. (*Id.* at 114–15).

During strip-searches of male detainees, the male officer conducting the search instructs the detainee to "take off all of his clothes," including underwear, all of which the officer searches. (Dkt. No. 44-3, at 33). The officer asks the detainee to lift his tongue and open his mouth and the officer inspects the gumline. (*Id.*). Next, the officer asks the detainee to "run his hands through his hair." (*Id.*). The officer then instructs the detainee to "pick up his genitalia . . . to make sure he didn't have anything under his scrotum," and to "turn around" and "bend over" to show "there's nothing between his butt cheeks" and allow for a visual inspection of the rectum. (*Id.* at 34).[7]

Following the strip-search, the detainee surrenders his or her clothes and receives jail-issued clothing. (Dkt. No. 44-2, at 112–13, 118–19). The detainee is then fingerprinted and

---

[7] In accord with the parties' briefing, and *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 325 (2012), the Court has referred to this search and visual inspection as a strip search.

undergoes the "booking procedure," which includes collecting "pedigree" information, conducting "suicide assessments," and completing a "tuberculosis medical questionnaire" and "pod paperwork." (*Id.* at 119). "90 percent of the time" the detainee enters GH1, one of the holding cells, following the strip search, where he or she could "make calls." [8] (*Id.* at 119–21). Once a detainee has completed his call, he would go to a housing unit. (*Id.* at 121). On "a good day," the booking officer would have the detainee from the booking area "to the [housing] unit . . . in an hour." (*Id.* at 120).

### B.     Plaintiff's Booking and Strip Search at Jefferson County Jail

On July 21, 2014, Plaintiff was arrested at his home[9] in LeRay, New York, on a bench warrant issued after he missed a court appearance in connection with a misdemeanor charge of aggravated unlicensed operation of a motor vehicle. (Dkt. No. 1, ¶ 31; Dkt. No. 44-1, at 21, 40). Local law enforcement transported Plaintiff to LeRay Town Court to be arraigned. (Dkt. No. 1, ¶ 31). The Judge set bail at $500 and asked Plaintiff if he had the money with him. (Dkt. No. 44-1, at 41). Plaintiff responded that he had $150 and asked whether the Judge would accept "that for the bail" because he "had to be at work in a few hours" and did not want to lose his job. (Dkt. No. 55-2, at 48). Plaintiff also said that he could "call [his] friend," Robert Bartleson, who could "get the rest and bring it . . . right now." (Dkt. No. 44-1, at 41). The Judge told Plaintiff that he did not "have time to wait" and that he was sending Plaintiff "to the jail to sit and wait." (*Id.* at 41). Before sending Plaintiff to the Jail, however, the Judge called Bartleson and told him to bring the bail money "to the jail." (*Id.* at 41–42). Bartleson said it would take "[a]bout a half

---

[8] Inmates from the housing unit are also brought into the cells in the booking area, where they are allowed to make phone calls concerning initial visitation. (Dkt. No. 44-2, at 172).

[9] During his deposition, Plaintiff initially testified that he was arrested while driving in his car on U.S. Route 11 in the Town of LeRay. (Dkt. No. 44-1, at 31). He then stated he was "flustered" and did not "recall where [he] was when [he] got arrested," (*id.* at 34), but that he "might have been at home when they came and picked [him] up" on the warrant, (*id.* at 36).

hour" for him to get to the Jail. (*Id.* at 43). The Judge told Plaintiff that he would be released

after bail was paid. (*Id.* at 41–42).

After court, the officer put Plaintiff "in the car and drove [him] to the Jefferson County

Jail"—a 15 to 20-minute drive. (*Id.* at 42–43, 44). During the drive, Plaintiff asked the

transporting officer if he could use his phone "to try to get ahold of" Bartleson. (Dkt. No. 55-2, at

51). The officer said yes, if Plaintiff, who was handcuffed, could reach his (Plaintiff's) phone.

(*Id.*). Plaintiff was able to reach his phone and called Bartleson on speakerphone. (*Id.* at 52).

Bartleson told Plaintiff that "[h]e was on his way to the jail right then" and that he had enough

money for bail.[10] (Id. at 52–53).

At the Jail, the officer turned Plaintiff "over to the intake officer," (Dkt. No. 55-2, at 54),

who took off his handcuffs and "made [him] put [his] hands . . . on the wall and spread" his feet

and "patted [him] down right there." (Dkt. No. 44-1, at 46–47). After the pat search, "[t]hey took

[his] wallet and stuff out of [his] pockets, [along with his] keys." (Dkt. No. 55-2, at 56).

Once inside the Jail, Plaintiff "went to [the] desk," where one male and one female guard

were sitting "on stools" behind a counter with computers. (Dkt. No. 44-1, at 48–49). The guards

told Plaintiff that his "friend called the jail" and was "on his way with the rest of the money,"

that he should "just hang tight right here at the desk."[11] (*Id.* at 49). "They took a stool from

behind the desk . . . and gave it to" Plaintiff. (*Id.*). "[T]hey pulled out the paper for the bail and

started filling that out because they knew he was on the way" and had taken the money Plaintiff

---

[10] This testimony is from Plaintiff's hearing under New York General Municipal Law § 50-h ("50-h Hearing"),
which was held on January 7, 2015. (Dkt. No. 55-2, at 2). During his deposition on April 23, 2019, Plaintiff testified
that he did not call Bartleson while he was being transported to the jail, but that the "officer might have." (Dkt. No.
44-1, at 1, 45).

[11] During the 50-h hearing, Plaintiff stated that the female guard asked Plaintiff if he "wanted to call and see how
close [Bartleson] was," Plaintiff said yes, and called Bartleson, who told Plaintiff he was 15 to 20 minutes away.
(Dkt. No. 55-2, at 56).

had with him, which Plaintiff "was going to apply . . . to the bail." (*Id.* at 55). When the guards

started taking Plaintiff's name and "birthday and all that," they told Plaintiff that "they weren't

processing [him] because [he is] bailed out pretty much" and Bartleson was "on the way." (*Id.* at

57). According to Jail records, Plaintiff's booking start time was 1:24 p.m. and booking end time

was 1:36 p.m.[12] (Dkt. No. 55-6, at 3).

Plaintiff testified that next, one of the officers "said that [Plaintiff] was going to be

released soon," but that another officer who "just came on shift" responded that "they have to

[search] everybody so he was going to search" Plaintiff. (Dkt. No. 44-1, at 60). Plaintiff stated

that he was at the Jail for 40–45 minutes before he was strip searched. (Dkt. No. 44-1, at 62).

That is consistent with jail records which indicate that Plaintiff was strip searched at 2:09 p.m.

(Dkt. No. 55-6, at 9).

Plaintiff went into the search room with the officer, who put on gloves and told Plaintiff

"to strip down to nothing." (*Id.* at 63, 87). When Plaintiff asked "why, if [he was] being

released?" the officer responded "it is procedure." (*Id.* at 63). Plaintiff took off his clothes, and

the officer had Plaintiff "stand there in front of him." (*Id.*) The officer "ran his fingers through

[Plaintiff's] hair" and then had Plaintiff open his mouth and lift his tongue so he could see inside.

(*Id.*). "[T]hen he had [Plaintiff] turn around" and "bend over." (*Id.*). The officer told Plaintiff "to

"lift up [his] testicles" and "to spread [his] butt cheeks and cough." (*Id.*). At that point, the

officer started to walk to Plaintiff; Plaintiff told the officer not to touch him. (*Id.* at 63–64).

Plaintiff felt humiliated. (*Id.* at 64). The entire search took "three to five minutes" and the officer

did not touch Plaintiff (other than to check his hair and mouth). (*Id.* at 65). Plaintiff was

---

[12] Plaintiff estimated that he sat at the counter, giving the guards his information for "[f]ive, ten minutes." (Dkt. No. 44-1, at 57).

fingerprinted and photographed in the search room. (*Id.* at 60–61). After the search, Plaintiff put

his clothes back on "[s]hoes, clothes, belt and everything." (*Id.* at 68).

The guards then directed Plaintiff to stand inside a cell, with the door open, while several

inmates from inside the facility walked through, so he "couldn't be within reach of those guys."[13]

(*Id.* at 58–59, 69). Plaintiff testified that he was in the cell "another 10, 15 minutes," when the

guards told him that that Bartleson "showed up" and "was filling out the paperwork for [his]

bail." (*Id.* at 59). But, according to the bail receipt, $500.00 was "received and counted" at 3:20

p.m. (Dkt. No. 55-4, at 22). Plaintiff testified that he was at the jail for approximately an hour,

(*id.* at 71), but Jail records reflect Plaintiff was released at 3:45 p.m., indicating that he was there

for approximately two and a half hours. (Dkt. No. 44-5).

## III.   LEGAL STANDARD

For a matter to proceed as a class action, a plaintiff must first satisfy four requirements:

(1) numerosity ("the class is so numerous that joinder of all members is impracticable");

(2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the

claims or defenses of the representative parties are typical of the claims or defenses of the

class"); and (4) adequacy of representation ("the representative parties will fairly and adequately

protect the interests of the class"). Fed. R. Civ. P. 23(a). In addition, the Second Circuit has

"'recognized an implied requirement of ascertainability in Rule 23,' which demands that a class

be 'sufficiently definite so that it is administratively feasible for the court to determine whether a

particular individual is a member.'" *Univs. Superannuation Scheme Ltd. v. Petróleo Brasileiro*

---

[13] When the inmates from within the facility walked through the booking area is in dispute. Defendant asserts that Plaintiff "was permitted to sit in the intake area without handcuffs for almost an hour before he was strip searched, and that the strip search occurred because a large number of inmates from the general population were being processed through the area for transport outside the Jail." (Dkt. No. 55-9, at 10). Plaintiff testified that the inmates walked through after he was strip searched. (Dkt. No. 44-1, at 59 (testifying that he went into open cell when the inmates walked through), 69–70 (testifying that he was strip searched before he "went into the cell")).

*S.A.* (*In re Petrobras Sec.*), 862 F.3d 250, 260 (2d Cir. 2017) (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)).

Assuming the requirements of Rule 23(a) are met, a class action may only be maintained if the plaintiff also qualifies the proposed class under one of the categories in Rule 23(b). Fed. R. Civ. P. 23(b). Here, Plaintiff seeks to certify the class for purposes of compensatory relief under Rule 23(b)(3). (*See generally* Dkt. No. 45). The court may certify a Rule 23(b)(3) class if it "finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The party seeking class certification bears the burden of satisfying Rule 23's requirements by a preponderance of the evidence. *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 384 (S.D.N.Y. 2016). Thus, "a court must 'probe behind the pleadings before coming to rest on the certification question,' satisfying itself that Rule 23 compliance may be demonstrated through 'evidentiary proof.'" *Johnson v. Nextel Commun. Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). "[T]his inquiry may sometimes overlap with merits issues, though the determination as to a Rule 23 requirement is not binding on the trier of fact in its determination of the merits." *Id.* "Furthermore, in order to certify a class, the proponent of class certification need not show that the common questions 'will be answered, on the merits, in favor of the class.'" *Id.* (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013)). While the requirements "are to be applied liberally," the court must still "conduct a rigorous analysis of the criteria set forth in Rule 23." *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 153–54 (S.D.N.Y. 2010). "A district judge is to assess all of the relevant evidence admitted at the class

certification stage and determine whether each Rule 23 requirement has been met, just as the

judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit."

*Miles v. Merrill Lynch & Co.* (*In re Initial Pub. Offerings Sec. Litig.*), 471 F.3d 24, 42 (2d Cir.

2006).

## IV.   DISCUSSION

### A.   Proposed Class

Plaintiff seeks to certify the following class:

> All persons who have been or will be placed into the custody of the
> Jefferson County Jail after being charged with misdemeanors,
> violations, traffic infractions, civil commitments or other minor
> crimes and being eligible for bail, and were or will be immediately
> strip searched upon their entry into the Jefferson County Jail
> pursuant to the policy, custom and practice of the Jefferson County
> Sheriff's Department and the County of Jefferson, and who posted
> bail within four hours of their entry into the facility. The class period
> commences on July 21, 2014 and extends to the date on which the
> Jefferson County Sheriff's Department and/or the County of
> Jefferson are enjoined from, or otherwise cease, enforcing their
> unconstitutional policy, practice and custom of conducting strip
> searches of pre-trial detainees absent providing them with a
> reasonable opportunity to post bail. Specifically excluded from the
> class are Defendant and any and all of their respective affiliates,
> legal representatives, heirs, successors, employees or assignees.

(Dkt. No. 45, at 16).

### B.   Fourth Amendment – Unreasonable Search

To determine what legal and factual questions are relevant to the class certification

inquiry with respect to Plaintiff's claim that Defendant subjected him to an unreasonable search

in violation of the Fourth Amendment, the Court looks to *Florence v. Board of Chosen*

*Freeholders of County of Burlington*, 566 U.S. 318 (2012), where the Supreme Court recognized

that "correctional officials must be permitted to devise reasonable search policies to detect and

deter the possession of contraband in their facilities," *id.* at 328, and considered "whether every

detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed" during the inmate intake process. 566 U.S. at 322. In *Florence*, the plaintiff was arrested on a bench warrant stemming from his failure to appear at a hearing to enforce a fine. *Id.* at 323. During intake processing, "prior to [his] admission to the general population" in two different facilities, he was subjected to searches that required him to, *inter alia*, "lift his genitals, turn around, and cough in a squatting position." *Id.* at 324–25. "This policy applied regardless of the circumstances of the arrest, the suspected offense, or the detainee's behavior, demeanor, or criminal history." *Id.* at 324. After the strip search at the second facility, Florence was admitted to general population and "released the next day, when the charges against him were dismissed." *Id.*  The Supreme Court held that the jails' policies, which permitted strip searches during the intake process, even without reasonable suspicion of concealed contraband, did not violate inmates' constitutional rights. *Id.* at 339. Justice Kennedy, writing for the majority, explained that "there is no mechanical way to determine whether intrusions on an inmate's privacy are reasonable," and that any analysis of the "need for a particular search must be balanced against the resulting invasion of personal rights." *Id.* at 327. This task "of determining whether a policy is reasonably related to legitimate security interests is 'particularly within the province and professional expertise of corrections officials.'" *Id.* at 328 (quoting *Bell*, 441 U.S at 548). Justice Kennedy further explained that, historically, the Court "has repeated the admonition that, 'in the absence of substantial evidence in the record to indicate that [prison] officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters.'" *Florence*, 566 U.S. at 328 (quoting *Block v. Rutherford*, 468 U.S. 576, 584–585 (1984)).

12

In assessing the security concerns related to the admission of inmates at a jail, Justice Kennedy cited to numerous and ever-changing "risks for facility staff, for the existing detainee population, and for a new detainee himself or herself." *Id.* at 330–31. These risks are present regardless of the severity of the crime for which the detainee was arrested, because of the reality that even non-felons "can turn out to be the most devious and dangerous criminals" or "may be coerced into" concealing items by others, even though they "do not themselves wish to introduce contraband into a jail." *Id.* at 334–35. And, these risks are not easily mitigated due to the difficult nature of classifying "inmates by their current and prior offenses before the intake search." *Id.* at 336. Justice Kennedy concluded that, because "[o]fficers who interact with those suspected of violating the law have an essential interest in readily administrable rules," requiring officials in charge of jails to "conduct less thorough inspections of some detainees" based on their individual factors would only serve to "limit the intrusion on the privacy of some detainees . . . at the risk of increased danger to everyone in the facility, including the less serious offenders themselves." *Id.* at 338. Thus, there are "significant reasons why the Constitution must not prevent them from conducting the same search on any suspected offender who will be admitted to the general population in their facilities." *Id.*

Part IV of the decision, joined by only four of the justices, noted that there may be circumstances in which the strip search policies upheld in *Florence* would be unreasonable. *Id.* at 338–39. There the justices noted that this case did "not require" it to "rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees." *Id.* at 338–39. Justice Roberts, one of four justices who joined Part IV, explained in a separate concurrence that the decision "did not foreclose the possibility of an exception to the

rule it announce[d]," under other circumstances, citing to the fact that *Florence* did not involve a minor traffic offense, and the fact that "there was apparently no alternative, if Florence were to be detained, to holding him in the general jail population." *Id.*, at 340 (Roberts, J. concurring).[14] *See also In re Nassau Cty. Strip Search Cases*, 639 F. App'x 746, 750–51 (2d Cir. 2016) (observing that "the Supreme Court indicated that categorically strip-searching the following two classes of detainees may not pass constitutional muster: (1) detainees charged with misdemeanors and segregated alone from the general population; and (2) detainees charged with misdemeanors and segregated with other detainees charged with misdemeanors from the general population").

In assessing the reasonability of a search, courts must consider whether the jail's "need for the particular search" outweighs "the invasion of personal rights that the search entails." *Williams v. City of Cleveland*, 771 F.3d 945, 950 (6th Cir. 2014) (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). "If a correctional institution possesses no readily available alternative other than to engage in the particular conduct at issue, its conduct likely is reasonably related to its legitimate penological interests." *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 90 (1987)). On the other hand, "the existence of 'obvious, easy alternatives . . . that fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests' suggests that the institution's need to proceed in its chosen manner does not outweigh the burdens it imposes upon the detainee and is therefore unreasonable." *Id.* (quoting *Turner*, 482 U.S. at 90–91). In addressing this claim, courts "must defer to the judgment of correctional officials unless the record contains substantial

---

[14] In dissent, Justice Breyer, joined by three other justices, concluded that such a search of "an individual arrested for a minor offense that does not involve drugs or violence" is unreasonable "unless prison authorities have reasonable suspicion to believe that the individual possesses drugs or other contraband." *Id.* at 343–44.

evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Florence*, 566 U.S. at 322–23.

### C.    Rule 23(a) Requirements

#### 1.    Numerosity

Rule 23(a)(1) first requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The proposed class in this case includes post-arraignment detainees who were charged with misdemeanors "or other minor infractions," who were "eligible for bail," "immediately strip searched upon entry" to the Jail, and "posted bail within four hours of their entry." (Dkt. No. 45, at 16). In general, "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Plaintiff has presented evidence that the Jail "processes approximately twelve (12) admissions per day." (Dkt. No. 55-7, ¶ 6). These admissions, however, include pre-arraignment detainees from the City, (Dkt. No. 44-2, at 155), which are not part of this action, (Dkt. No. 45, at 14 n.9), as well as post-arraignment detainees who were charged with felonies, (Dkt. No. 44-2, at 132), which, according to Defendant, could comprise half of the post-arraignment detainees that arrive at the Jail, (*id.*). Defendant therefore argues that Plaintiff's estimates are faulty because they "include pre-arraigned city detainees" and assert that despite receiving "extensive booking records" from Jefferson County, Plaintiff has "done nothing with those records in an effort to support the conclusion that the numerosity/practicability requirement is satisfied." (Dkt. No. 55-9, at 27).

"[I]n assessing numerosity a court may make 'common sense assumptions' without the need for 'precise quantification of the class.'" *Russo v. CVS Pharmacy, Inc.*, 201 F.R.D. 291, 295 (D. Conn. 2001) (quoting *Pecere v. Empire Blue Cross & Blue Shield*, 194 F.R.D. 66, 69 (E.D.N.Y. 2000)); *see also* 1 Herbert B. Newberg, Newberg on Class Actions: A Manual for

Group Litigation at Federal and State Levels § 3.05, at 139 (2d ed. 1985). Further, the numerosity inquiry is not "strictly mathematical." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014). Rather, it "must take into account the context of the particular case, in particular whether a class is superior to joinder based on other relevant factors including: (i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, [and] (iv) their ability to sue separately." *Id.*

In view of the evidence that the Jail receives approximately 360 admissions per month, even if post-arraignment detainees charged with misdemeanors or minor infractions comprise a small percentage of those admissions, given that the class period is more than five years, it is reasonable to conclude there are more than 40 potential class members. Further, according to the Complaint, "class members are likely dispersed over a large geographical area, with some members presently residing outside of Jefferson County and this Judicial District" and "low-income persons, [who] may not speak English, and likely would have great difficulty in pursuing their rights individually." (Dkt. No. 1, ¶ 9). Thus, as there may be well in excess of forty class members who are unlikely to have the financial resources to sue separately, judicial economy favors certification over joinder.

## 2. Commonality

Next, a plaintiff seeking class certification must show "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A question of law or fact is common to the class if the question is capable of classwide resolution—which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Johnson,* 780 F.3d at 137 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)) (citations and internal marks omitted). The common question(s) must generate "common answers apt to drive the resolution of the litigation." *Wal-Mart Stores,* 564 U.S. at 350 (internal quotation marks and

emphasis omitted). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson*, 780 F.3d at 137 (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014)).

Plaintiff contends there are common legal and factual issues that will affect the proposed class, including: (i) whether the Jail's implementation of "a blanket wide policy to strip and visual cavity search all individuals charged with misdemeanors or minor crimes, without reasonable suspicion . . . and prior to giving them a reasonable opportunity to post bail," is constitutional, (ii) "whether four hours is a reasonable period of time to allow individuals to post bail before they are mandated to undergo" such a search, and (iii) whether the Jail "had adequate space to hold detainees apart from the general population for a reasonable period of time to allow them to post bail." (Dkt. No. 45, at 22).

Here, Plaintiff claims he was harmed by the Jail's policy of strip searching every misdemeanor and minor offense detainee "immediately" because he was strip searched prior to being released on bail and having never entered the general population or a cell with other detainees—the Jail's purported justification for immediate strip searches. *See In re Nassau County*, 639 F. App'x at 750–51 ("[T]he Supreme Court indicated that categorically strip-searching the following two classes of detainees may not pass constitutional muster: (1) detainees charged with misdemeanors and segregated alone from the general population; and (2) detainees charged with misdemeanors and segregated with other detainees charged with misdemeanors from the general population."). But Plaintiff's claim stems from not only the physical space of the seven-cell booking area but the particular circumstances of the time he spent at the Jail on July 21, 2014, from approximately 1:25 to 3:45 p.m. (Dkt. No. 55-6, at 3; Dkt. No. 55-4, at 22; Dkt. No. 44-5). When Plaintiff arrived, there were at least two intake

17

officers and one person in a cell; one or two detainees arrived after Plaintiff, and seven to ten inmates entered the booking area from within the facility to be strip searched while Plaintiff was there. (Dkt. No. 44-1, at 50–52). Plaintiff argues that there was, therefore, sufficient space and staff to enable Plaintiff to remain isolated in the booking area waiting for his friend to bring bail, without having to enter the general population.

There is evidence, however, that the booking area, which is staffed by two officers, is used, on a daily basis, for holding City detainees as well as felony, misdemeanor, and minor offense post-arraignment detainees, who must be separated by gender, and processing "dozens of inmates" through the seven-cell "booking area daily for purposes of court appearances, medical issues, disciplinary issues and removal to other facilities." (Dkt. No. 55-7, ¶ 6). Thus, whether there were "readily available alternatives" to placing a misdemeanor detainee with felony detainees or in the general population, which would necessitate a strip search, during the four hours (or less) the detainee spent at the Jail prior to release, would depend on the circumstances at the time the potential class member was in the booking area of the Jail. Indeed, litigating the question of whether there was a blanket policy to "immediately" strip search misdemeanor and minor offense detainees would not resolve the issue central to the validity of the claims of each potential class member; the reasonableness of each potential class member's strip search depends on individualized proof regarding the activity and staffing in the booking area of the Jail at the time he or she was there. *See Mothersell v. City of Syracuse*, 289 F.R.D. 389, 394–95 (N.D.N.Y. 2013) (finding the plaintiff failed to show commonality where "the claim of each prospective class member depends not on generalized proof of whether there was an unconstitutional blanket strip search policy, but rather on highly individualized proof regarding the circumstances of each strip search").

Likewise, Plaintiff has failed to show that the question whether the Jail "had adequate space to hold detainees apart from the general population for a reasonable period of time to allow them to post bail" will generate "common answers apt to drive the resolution of the litigation." *Wal-Mart Stores*, 564 U.S. at 350. Instead, there will be different answers depending on the activity and staffing in the booking area during the relevant time period, (*see, e.g.*, Dkt. No. 44-2 (Gallamore testifying that in the booking area, "the [m]ajority of the time," the "day shift" was the busiest, the evening shift was "second busiest," and the "graveyard shift" was the "least busy"); Dkt. No. 44-3, at 63–65 (Newton testifying that if "it wasn't a busy day," it might be possible to isolate a detainee to allow an opportunity to post bail but stating that other times, there "could be" twelve detainees at the same time in the booking area). *See McDonald v. Franklin Cty., Ohio*, 306 F.R.D. 548, 561–62 (S.D. Ohio 2015) (finding the plaintiff failed to meet commonality and typicality requirements where the proposed class of misdemeanor detainees were strip searched for placement in general population rather than held in the booking area, where they "could have avoided a strip search," because, inter alia, "each class member's claim will differ based on the activity in the booking area on the day she was admitted" as "booking area was needed for intake, housing mental health inmates, intoxicated inmates, and inmates awaiting transfer"). Thus, Plaintiff fails to meet the commonality requirement for class certification.

### 3. Typicality

Typicality "requires that the claims of the class representatives be typical of those of the class." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)). This requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to

prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)

(quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)). "[T]he

test for typicality is not demanding." *Pyke v. Cuomo*, 209 F.R.D. 33, 42 (N.D.N.Y. 2002)

(internal quotations marks and emphasis omitted). "When it is alleged that the same unlawful

conduct was directed at or affected both the named plaintiff and the class sought to be

represented, the typicality requirement is usually met irrespective of minor variations in the fact

patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir.

1993).

Construing the allegedly unconstitutional conduct as the "immediate[] strip search" of all

potential class members "upon their entry" into the Jail, Defendant argues that Plaintiff's claim

"does not 'arise from the same course of events' of the Proposed Class." (Dkt. No. 55-9, at 41).

Defendant asserts that because there is evidence that Plaintiff "was not immediately strip

searched upon" entry but was allowed to sit "for almost an hour to wait for the arrival of his bail

money," and would not have "been processed had his bail money showed up in a timely

manner," this factual deviation precludes class certification. (*Id.*). Even assuming, however, that

this factual issue did not defeat typicality, Plaintiff's claim that holding him in isolation until he

was released on bail was a "readily available alternative" to strip searching him in preparation

for placement in the general population or with other detainees, depends on the particular

circumstances of the booking area when he was there. There is no evidence that Plaintiff's

experience at the Jail, where the other cells were largely unoccupied, was typical of that of

potential class members. Plaintiff has submitted one booking record that shows the date and time

of another detainee's arrest and release and indicates that the detainee was strip searched. (Dkt.

No. 44-4). That booking record reveals nothing about the circumstances of the Jail at the time the

detainee was there, or whether, as discussed below, the detainee was placed in the Jail's general population. (Dkt. No. 44-4). Thus, there is no basis for finding that Plaintiff has shown typicality. *Scaggs v. New York State Dep't of Educ.*, No. 06-cv-0799, 2009 WL 890587, at *6 (E.D.N.Y. Mar. 31, 2009) (finding the plaintiff failed to show typicality where they did not provide "a single piece of evidence that potential class members at the other schools shared experiences similar to those that allegedly occurred" at the defendant school).

Further, Plaintiff fails to address whether the potential class members entered the general population following their strip searches or whether that fact would interfere with typicality of his claim and a finding of liability for any such class members. *See Fonder v. Sheriff of Kankakee Cty.*, 823 F.3d 1144, 1146 (7th Cir. 2016) ("But there is a mismatch between the rationale of *Florence* and the class definition in this suit—for the class includes all arrestees, *whether or not* they enter a jail's population."); *Pitney v. City of Chester*, 19-cv-799, 2020 WL 2571100, at *6, 2020 U.S. Dist. LEXIS 89138, at *19 (E.D. Pa. May 20, 2020) ("Not surprisingly, courts applying *Florence* have consistently ruled that critical to its holding was the detainee's placement in the prison's general population, which triggered the security concerns that comprised the bulk of the Court's analysis." (citing *Fonder*, 823 F.3d at 1147; *Cantley v. W.V. Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201, 208 (4th Cir. 2014))). Accordingly, Plaintiff has failed to meet the typicality requirement.[15]

### D.     Rule 23(b)(3) Requirements

Moreover, even assuming Plaintiff could meet the initial requirements for certification under Rule 23(a), he fails to meet his burden of showing predominance. Rule 23(b)(3) requires a

---

[15] Having concluded that Plaintiff fails to meet Rule 23(a)'s commonality and typicality requirements, the Court does not consider whether Plaintiff satisfies the adequacy of representation or ascertainability requirements.

showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Even assuming Plaintiff could show a class action would be a superior method to adjudicate this case, he has failed to show common issues of law or fact predominate over individual issues. "A district court may only certify a class under Federal Rule of Civil Procedure 23(b)(3) if 'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Petrobras*, 862 F.3d at 270. "This predominance requirement 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, at 96–97 (2d Cir. 2018) (quoting *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016)). The predominance requirement is satisfied if: "(1) resolution of any material legal or factual questions can be achieved through generalized proof, and (2) these common issues are more substantial than the issues subject only to individualized proof." *In re Petrobas Sec.*, 862 F.3d 250, 270 (2d Cir. 2017) (internal quotations, citations, and formatting omitted). The distinction between individual and common questions is "central to the predominance analysis." *Id.* The Supreme Court has explained that an "individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (alteration in original) (internal quotation marks omitted). The predominance requirement is "far more demanding" than the commonality requirement under Rule 23(a), and it

is not satisfied "simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

"Where individualized questions permeate the litigation, those 'fatal dissimilarit[ies]' among putative class members 'make use of the class-action device inefficient or unfair.'" *Petrobras*, 862 F.3d at 270 (quoting *Amgen Inc.*, 568 U.S. at 470). "The predominance inquiry mitigates this risk by 'ask[ing] whether the common, aggregation-enabling, issues in the case are *more prevalent or important* than the non-common, aggregation-defeating, individual issues." *Id.* (quoting *Tyson Foods*, 136 S. Ct. at 1045). For this reason, courts must give "careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods*, 136 S. Ct. at 1045. "This analysis is more . . . qualitative than quantitative and must account for the nature and significance of the material common and individual issues in the case." *Petrobras*, 862 F.3d at 271 (internal quotation marks and citation omitted). In undertaking this analysis, the Court is mindful of its "'duty' . . . to 'take a close look' at whether the common legal questions predominate over individual ones." *Langan*, 897 F.3d at 97 (quoting *Comcast*, 569 U.S. at 34).

Here, the class definition *may* implicate *some* broad liability issues, including whether there is a blanket strip-search policy for County detainees and whether there is a "legitimate justification" for such searches of detainees charged with misdemeanor or minor offenses. (Dkt. No. 45, at 9). But, as discussed in connection with commonality, the issue of whether the Jail "had the space to segregate new detainees from the general population," (Dkt. No. 45, at 9), and thus a "readily available alternative" to strip searching a misdemeanor or minor offense detainee, in preparation for placement in the general population, will require individualized evidence regarding the staffing and activity level of the booking area at the time the detainee was processed. Indeed, the only evidence that there may be space available to hold a misdemeanor or

minor offense detainee in isolation for a limited time before release on bail is Plaintiff's testimony regarding his experience and pictures of the holding cells in the booking area. (Dkt. No. 44-1; Dkt. No. 44-6). The single booking record Plaintiff filed in support of the motion for certification contains only the date and time of the detainee's arrest and release and the fact the detainee was strip searched. (Dkt. No. 44-4).

In addition, there may be, as Defendant argues, individual issues regarding whether the "immediate" strip search policy was uniformly applied, since the only evidence before the Court regarding the application of the policy concerns Plaintiff, who was permitted to wait in the intake area for approximately forty minutes before being strip searched. (Dkt. No. 44-1, at 62; Dkt. No. 55-6, at 9). Thus, Plaintiff has failed to show that "questions of law of fact common to class members predominate over . . . questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). *See also In re Nassau County*, 639 F. App'x at 751 (noting that the plaintiffs' citation of "the declarations of three class members" in support of their assertion that "*many* class members had not had their detention reviewed by a judicial officer at the time they were . . . strip searched" called into "grave doubt whether" the plaintiffs could satisfy the predominance requirement (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 (2d Cir. 2008) (holding that it is the plaintiff's burden to prove predominance by a preponderance of the evidence)).

In addition, Plaintiff concedes "there will be some difficulty in deciding damages amongst class members, starting with their own representative plaintiff, who, by virtue of his unique experience, may have been more susceptible to emotional harm than other detainees." (Dkt. No. 45, at 28). While individualized issues as to damages alone would not necessarily

preclude certification as the court may certify a liability class only, *see* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); *Johnson*, 780 F.3d at 138 ("Common issues—such as liability—may be certified, consistent with Rule 23, even where other issues—such as damages—do not lend themselves to classwide proof."), it is a factor that must be considered. *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) ("It is true that the law of this Circuit is that the fact that 'damages may have to be ascertained on an individual basis . . . is . . . a factor that we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues.'" (quoting *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008)). In view of the individualized liability issues regarding the circumstances of potential class members' strip searches and the lack of evidence showing that common questions of law and fact predominate over "questions affecting only individual members," Plaintiff has failed to meet the predominance requirement. Accordingly, because Plaintiff has failed to satisfy Rules 23(a) and 23(b), his motion for class certification is denied.

## V.   CONCLUSION

For these reasons, it is

**ORDERED** that Plaintiff's motion for class certification (Dkt. No. 43) is **DENIED.**

**IT IS SO ORDERED.**

Dated:  June 18, 2020

Brenda K. Sannes
U.S. District Judge